IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

KELLY PIFFERINI, )

)

Plaintiff Pro Se, )

)

v. ) Case No. 1:24-cv-09191-RMI

)

CITY OF EUREKA; DONALD WILKES; ) FOURTH AMENDED COMPLAINT FOR

COLE FORBES; and JON OMEY, ) DAMAGES AND DECLARATORY RELIEF

)

Defendants. )

__________________________________________)

Plaintiff Kelly Pifferini, proceeding pro se, brings this Fourth Amended Complaint against Defendants City of Eureka, Donald Wilkes, Cole Forbes, and Jon Omey, and alleges as follows:

## I. JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as it arises under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983.

2. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because the events, acts, and omissions giving rise to the claims occurred within this judicial district, specifically in the City of Eureka, Humboldt County, California.

## II. REVISED STATEMENT OF FACTS

### A. Plaintiff and the Waterfront Trail

3. Plaintiff Kelly Pifferini is an unhoused resident of Eureka, California.

4. During the relevant period, Plaintiff used public land along the Waterfront Trail near the foot of Truesdale Street and behind Bayshore Mall, near Planet Fitness, to keep and transport his belongings.

5. From October 2023 through February 12, 2024, Plaintiff had repeated contacts with City employees and Eureka Police Department personnel concerning his presence in public areas, his personal property, and his political expression concerning municipal policies affecting unhoused residents.

6. Victoria Graham was employed by the City as a Community Service Ranger or Municipal Ranger. During Plaintiff’s contacts with her, she wore a City uniform, operated a City enforcement vehicle, and communicated over a police radio.

7. Donald Wilkes and Cole Forbes were City of Eureka Public Works employees who performed work on the Waterfront Trail and surrounding public areas. Officer Jon Omey was a Eureka Police Department officer assigned to the CSET team.

B. Section 130.14 and the City Notice

8. Eureka Municipal Code § 130.14 regulates the storage of personal property in public areas.

9. Section 130.14(C)(3) provides the general notice procedure for property placed in a public area and states that property is deemed stored if it is not removed within 24 hours after service of written notice, subject to the other provisions of the ordinance.

10. Section 130.14(C)(6) separately addresses property that poses an immediate threat to the health or safety of the public and permits removal without prior notice under the circumstances specified there.

11. Section 130.14(D)(1) specifies information required in a pre-removal notice under § 130.14(C)(3), including a property description, location, date and time posted, the 24-hour impoundment statement, retrieval information, and the applicable disposal period.

12. The ordinance identifies Ordinance 844-C.S. as having been passed on August 2, 2016.

13. Plaintiff possesses a City form titled "NOTICE TO VACATE." The form states: "It is a violation of law to camp on public or private property within the

City of Eureka. It is also a violation of law to encroach or obstruct any public right of way and/or to store personal property on public land. All personal property must be removed immediately."

14. The form then states that personal property that is not deemed a hazard or abandoned and remains after 72 hours of the notice will be removed by the City, booked as found property, and may be reclaimed by calling the listed number and scheduling pickup, with unclaimed property disposed of after 90 days.

15. The form states that it applies to personal property deemed to have been relocated to another area within the City or public right of way in response to the notice.

16. The form bears the notation "EPD #130-9/2021" and identifies Graham as the issuing employee. Plaintiff’s copy bears a handwritten date of November 9, 2023.

17. Thus, the printed form uses a 72-hour period in its ordinary property-removal language, while § 130.14(C)(3) describes a 24-hour period for the general notice procedure.

18. The printed form contains text that simultaneously invokes low-level administrative property regulations and explicit criminal code prohibitions, threatening criminal law enforcement actions by stating that camping and storage are "violations of law" while concurrently setting forth a passive 72-hour administrative timeline for municipal cleanup and property impoundment.

19. The text of the form commands that "All personal property must be removed immediately," while the subsequent sentence of the exact same

document states that property will only be removed by City personnel if it remains "after 72 hours of the notice."

20. The tracking and relocation clause on the form states that its terms apply to property "deemed to have been relocated to another area within the City," permitting City personnel to treat a notice served at one specific geographic location as an active enforcement mechanism against the same property when encountered at an entirely separate location.

21. The notice form bears the institutional branding and header of the Eureka Police Department ("EPD"), but is routinely executed, filled out, and issued by unsworn, civilian Municipal Rangers who lack statutory peace-officer authority under California law to make warrantless arrests or issue criminal citations.

C. August 2, 2016 City Council Meeting

22. On August 2, 2016, the Eureka City Council considered the measure that resulted in Ordinance 844-C.S. and § 130.14.

23. According to the public-record materials reviewed by Plaintiff, during the meeting the City Attorney stated that she did not know the language that would be placed in the property-collection notice because she had not written that notice language.

24. According to the same materials, the City Manager stated that he did not know what text would be included because he was not writing the notice text.

25. The City Council then voted on the enforcement measure.

## D. October 19, 2023 Encounter

26. On October 19, 2023, Plaintiff was at the Waterfront Trail area near the encampment when Graham approached him in her City capacity.

27. Graham asked whether Plaintiff lived there, and Plaintiff answered that he did.

28. Graham told Plaintiff that he needed to leave and that he was trespassing because a notice had previously been posted.

29. Plaintiff told Graham that an attorney had advised him concerning his ability to remain, gave Graham the attorney's name, and told her that he had not personally received a notice directing him to leave.

30. Plaintiff asked Graham for direct notice, but Graham initially refused and continued telling Plaintiff that he was trespassing.

31. Plaintiff asked Graham to contact her supervisor, and Graham subsequently requested police assistance.

32. Officer DT arrived and told Plaintiff that Graham wanted him to leave. Plaintiff explained that his belongings were numerous and that he could not immediately leave without addressing them.

33. Plaintiff understood the notice being discussed to provide approximately 72 hours and told the officers that he believed the applicable ordinance was being applied differently from its written requirements.

34. Sergeant John Eckert became involved and consulted with a Fish and Wildlife officer concerning the high-water-mark area and Fish and Game Code sections 5650 and 5652.

35. Eckert offered City trucks to assist Plaintiff in moving his property. Plaintiff stated he had nowhere else to go and reiterating his understanding that he had 72 hours.

36. Eckert asked Plaintiff for a timeline. Plaintiff told Eckert it was his understanding that the notice he had just received gave him a 72-hour timeline, but Eckert refused that timeline and told Plaintiff that the 72 hours had begun when the notice was attached rather than when Plaintiff personally received or became aware of it.

37. Eckert stated that he was not there to enforce the camping ordinance during that encounter and was there concerning Fish and Game violations.

38. Eckert contacted a superior officer concerning what action would be taken that day and what would happen to Plaintiff and his property.

39. After that discussion, Eckert told the other officers that they were waiting for the Captain to decide how to proceed. The body-worn-camera recordings capture portions of this command-level discussion.

40. Following the command discussion, Eckert arrested Plaintiff for alleged Fish and Game Code violations. Plaintiff did not physically resist.

41. Plaintiff was transported to jail and later released. The criminal charges arising from the October 19 arrest were later dismissed in the interest of justice.

## E. Modifications to Property Transportation

42. After October 19, Plaintiff changed the manner in which he transported and secured his belongings.

43. Plaintiff utilized a bicycle-and-trailer arrangement so that his belongings were elevated, secured, and mobile rather than left loose on the ground.

44. Ranger Graham's continuing contacts with Plaintiff after October 19 often focused on his physical location and the nature of his property setup.

45. During these encounters, Graham consistently categorized Plaintiff's activities as unauthorized camping or as direct violations of prevailing municipal guidelines.

46. Plaintiff routinely defended his presence by explaining to Graham that he did not remain overnight at those specific locations.

47. Because Ranger Graham's operational shift began after the park opened and concluded before it closed, she lacked personal observation of the site during late-night hours.

48. Throughout this multi-month sequence of enforcement contacts, Plaintiff maintained his belongings on the mobile bicycle-and-trailer framework.

49. Available records indicate that Plaintiff was issued approximately five or six administrative notices or formal warnings over this four-month interval.

50. Officer Omey’s formal written report from February 12 explicitly details a sequence of five distinct law enforcement contacts occurring in early 2024.

51. The specific log entries cited in that report include January 9, January 24, January 30, February 6, and February 7, 2024.

52. The report clarifies that the February 6 contact involved Ranger Graham executing and serving a formal "Notice to Vacate" directly to Plaintiff.

53. Officer Omey’s documentation confirms that he acted as Ranger Graham’s direct supervisor and maintained administrative oversight of those responses.

54. On February 6, Graham approached Plaintiff, explicitly stated she was issuing a violation for camping, and handed him the paperwork.

55. Plaintiff immediately countered that he was not camping and challenged her application of the municipal rules, an exchange preserved on body camera footage.

56. Alongside these property disputes, Plaintiff engaged in regular, peaceful political expression highlighting the municipal treatment of unhoused community members.

57. This expression frequently took the form of handwritten chalk messages on the pavement of the Waterfront Trail, which Plaintiff called "Chalk Talk."

58. Public Works employee Donald Wilkes frequently observed these chalked political messages while performing his routine duties along the trail system.

59. For a three-year period during the summer months, Wilkes systematically utilized a municipal water truck to wash away Plaintiff's sidewalk messages.

60. For approximately three years during summer months, Wilkes systematically utilized a municipal water truck to erase Plaintiff’s political Chalk Talk messages along the Waterfront Trail.

61. The operational deployment of a municipal water truck—including vehicle tracking, water usage logs, and staff assignments—requires administrative authorization, meaning a municipal record of these clearing operations inherently exists within the City's operational logs.

62. Given the scale, resource allocation, and multi-year repetition of these erasure operations, Defendant Wilkes did not act on his own isolated initiative; rather, a superior municipal official or administrative authority directly ordered, scheduled, or approved the systematic destruction of Plaintiff's political expression.

63. On the morning of February 12, 2024, Plaintiff arrived near Truesdale Street to conduct a focused, one-person political demonstration.

64. Having loaned his bicycle to an acquaintance for the day, Plaintiff was protesting on foot and parked his mobile trailer near the public restrooms.

65. Plaintiff constructed a large political display measuring roughly three feet by six feet, using reclaimed wooden pallets and cardboard.

66. Photographic records and police summaries confirm that the sign was positioned off the main walkway and did not obstruct public foot traffic.

67. The display was prominently titled "Camp Legal" in large letters.

68. The text on the sign stated: "The area shaded in blue is a legal camping area. It is public space that 75 ft off of the trail, 150 ft away from the water, It’s not part of the golf course or any of the business districts, It’s outside of this park. This makes it legal."

69. The cardboard backing featured a hand-drawn map with a specifically shaded zone marked "215yrds x 20. yrds. Or 38,700 square foot."

70. Plaintiff intended for this display to broadcast his legal interpretation of the city's geographical restrictions and educate the public on where camping was permitted.

71. Employee Cole Forbes arrived at the scene in a municipal work vehicle and took photographs of the "Camp Legal" sign.

72. Forbes immediately sent those photographs to Officer Omey to alert him to the presence of the new display.

73. Officer Omey’s subsequent police report notes that he received the photograph from Public Works at approximately 0849 hours.

74. The report documents that the sign was propped against pallets near the parking lot and contained a handwritten map detailing a purportedly lawful camping area.

75. The report notes that Public Works staff identified Plaintiff as the creator and intended to clear the items away immediately.

76. While Plaintiff briefly walked away from the immediate area, municipal employees removed and confiscated the original sign.

77. Upon discovering the removal, Plaintiff immediately built an identical replacement display using two additional wooden pallets.

78. Shortly thereafter, two municipal work trucks pulled up to the location, and Donald Wilkes stepped out to dismantle the replacement sign.

79. Plaintiff verbally confronted Wilkes, demanding that he leave the sign alone, to which Wilkes responded that the police department had authorized the clearing.

80. Plaintiff instructed an observer named Erik Zimmerman to watch over his remaining trailer while he walked toward a Wi-Fi source to contact police.

81. Before Plaintiff could place a call or secure a connection, Officer Omey intercepted him in a marked patrol unit and ordered him onto the curb.

82. Plaintiff complied with the order and immediately reported that Public Works staff had seized his political signs under a claim of police authorization.

83. When Plaintiff asked if the workers actually possessed the authority to take his signs, Officer Omey replied on camera, "Yeah, absolutely."

84. Officer Omey then placed Plaintiff under arrest, citing an outstanding misdemeanor warrant found during a system check.

85. Dispatch had previously notified Omey while he was en route that the active warrant was tied to prior Fish and Game Code allegations.

86. Omey's report notes that he stopped Plaintiff roughly one block east of the parking lot, activated his emergency lighting, and applied handcuffs.

87. Plaintiff submitted to the arrest without any physical resistance or attempts to evade the officer.

88. When Plaintiff questioned whether he was facing new charges, Omey stated he would return to the trailer's location to assess the scene.

89. Omey explicitly referenced Ranger Graham’s ongoing frustrations regarding Plaintiff’s perceived non-compliance with her prior directives.

90. Plaintiff was placed into a transport vehicle and removed from the trail area to be booked at the local jail facility.

91. At the moment Public Works employees began cutting the trailer apart, Plaintiff was locked in custody and was no longer at the scene.

92. Omey’s report notes that at 0936 hours, Wilkes called to report that he and Forbes had been verbally berated by Plaintiff during the sign removal.

93. The documentation states that Wilkes and Forbes discovered the pallets and cardboard display at 0930 hours and began clearing them out.

94. Forbes mentioned to Wilkes that he had already removed a similar set of pallets and an identical sign from that exact spot earlier that morning.

95. The report asserts that Plaintiff approached the workers from the south, near the location of his mobile camper trailer.

96. The report attributes verbal statements to Plaintiff, alleging he yelled, "That’s my shit. You can’t take it," and tried to reclaim the items.

97. Wilkes countered that the pallets and cardboard were considered loose debris on the trail and would be treated as trash.

98. The report states that Plaintiff then shouted, "You can’t do this to me! I have my rights here!" followed by, "Well you fucking suck at your job."

99. Based on this verbal exchange, Wilkes informed Officer Omey that he wished to press formal criminal charges against Plaintiff.

100. Forbes provided a corroborating statement, noting he found the first sign at 0820 hours and that it was the second consecutive day a sign had appeared there.

101. Forbes stated that after clearing the first display, he returned with Wilkes only to find that Plaintiff had already erected a replacement.

102. The report claims Plaintiff used profanity during the second encounter, shouting about the effort it took to build the replacement signs.

103. While Plaintiff was held in the back of the patrol vehicle, Wilkes and Forbes visually identified him as the individual involved in the dispute.

104. Officer Omey noted his familiarity with Plaintiff, stating that the CSET team had interacted with him regularly regarding trail storage.

105. The report reiterates the recent timeline of contacts, listing the specific dispatch logs from January and February as context for the escalation.

106. Omey highlighted the February 6 interaction, noting he was fully aware that his subordinate, Ranger Graham, had served a Notice to Vacate.

107. Graham had previously reported to Omey that Plaintiff continued to maintain a large footprint of property near the Truesdale parking lot.

108. Graham further alleged that when she tried to address these municipal violations, Plaintiff responded by raising his voice at her.

109. Omey stated that this cumulative history of property disputes and the morning's call prompted his direct physical response to the scene.

110. Omey states that because of the most recent issue and the ongoing issues, he told Wilkes he would respond to the location.

111. After speaking with Wilkes, Forbes, and another person at the scene, Omey's report states that he concluded Plaintiff had shown a pattern of aggressive behavior toward persons maintaining the public trail system.

112. The report states that Omey believed Plaintiff had shouted derogatory words and insults at Wilkes and that Wilkes felt intimidated.

113. Omey's report states, based on his investigation and Wilkes's desire to pursue charges, Omey took Plaintiff into custody for Penal Code § 415(3), in addition to the warrant.

114. When Omey told Plaintiff he was also being taken into custody for disturbing the peace, Plaintiff spontaneously stated that he had not shouted at anybody.

115. While Plaintiff remained in custody, Omey remained at the scene and dealt with Plaintiff’s property.

116. Omey’s report states that Plaintiff’s makeshift trailer contained a large amount of unsecured property scattered around and inside it.

117. Omey states that he collected property that could be booked for safekeeping.

118. Omey states that he found capped and uncapped hypodermic syringes inside the trailer, some appearing to have blood on or inside them, and a large amount of marijuana.

119. Omey states that he photographed the items before collecting them and booked the photographs as evidence on the M-Drive.

120. Omey states that property that was not trash or a hazard to store was collected and later booked for safekeeping.

121. Omey states that, for health and safety reasons, he was unable to collect all property, and that items that could not safely be stored by EPD were transported to Humboldt Waste Management by Wilkes and Forbes.

122. The police property record identifies camping supplies including a crab pot, miscellaneous clothing, and tools as safekeeping property later returned to the owner on February 16, 2024.

123. The property record separately identifies a Nalu kite surfboard and multicolored kite as safekeeping property later returned to the owner on February 16, 2024.

124. The property record identifies approximately 2.3 pounds of marijuana as seized property booked for destruction.

125. Plaintiff's body-worn-camera evidence shows City personnel and Omey dealing with Plaintiff's trailer and its contents while Plaintiff remained in custody.

126. The BWC evidence reviewed by Plaintiff places powered reciprocating-saw activity directed at the trailer at approximately 28:15–29:00 and again at approximately 48:00–48:20.

127. Plaintiff was not present at the trailer during those portions of the recording because he remained in police custody.

128. The BWC evidence also shows the condition and contents of the trailer, including items Plaintiff identifies as blankets and clothing.

129. Plaintiff did not consent to destruction of his trailer or voluntarily surrender the property for destruction.

130. By February 12, 2024, Plaintiff had received multiple City enforcement contacts concerning camping and personal property.

131. Omey's written report connected the February 12 response with those earlier contacts by listing the January and February CAD events and the February 6 Notice to Vacate.

132. Omey's report states that he was Ranger Graham's direct supervisor and that he knew she had handled several prior calls.

133. At the beginning of the February 12 response, the immediate event reported to Omey was the removal of Plaintiff’s political sign and pallets by City Public Works employees.

134. Omey’s report states that Wilkes first sent a photograph of the sign to Omey at approximately 0849 hours and then told Omey he would respond to remove the sign and pallets.

135. The report states that Wilkes later called Omey at approximately 0936 hours concerning the confrontation while Wilkes and Forbes were removing the sign and pallets.

136. Body-worn-camera footage records that prior to approaching the restroom area where Plaintiff’s property was located, and prior to inspecting the contents of the trailer, Defendants Wilkes, Forbes, and Officer Omey engaged in a verbal conversation. During this conversation, City personnel discussed sending Plaintiff's property to the dump and stated, "we might need a trailer, you better go grab a trailer."

137. Omey then located Plaintiff, arrested him on the warrant, returned him to the scene, interviewed Wilkes and Forbes, and later arrested Plaintiff for PC 415(3).

138. While Plaintiff remained in custody, Omey remained at the scene and dealt with Plaintiff’s property.

139. The February 12 events followed approximately four months of repeated City contacts involving the same general location, Plaintiff’s property, and Plaintiff’s political activity.

140. The October 19, 2023 encounter was recorded in substantial part by body-worn cameras worn by Graham and Sergeant Eckert.

141. The February 6, 2024 encounter was recorded by Graham’s body-worn camera.

142. The February 12, 2024 encounter was recorded in substantial part by Omey's body-worn camera.

143. Omey's written misdemeanor report is Eureka Police Department Case 24-000611 and states that body-worn-camera footage was recorded.

144. Public-record video of the August 2, 2016 City Council meeting documents that the City Council voted to approve the enforcement measure and ordinance despite statements by the City Attorney and City Manager that the text of the property-collection notice form had not yet been drafted or written.

145. The police report and associated property records document both safekeeping and seized property associated with the February 12 incident.

146. Plaintiff has compared portions of the recordings with the written reports, notices, and other records.

147. Where an exact quotation or timestamp remains subject to final verification, Plaintiff identifies it as approximate rather than verbatim.

148. Plaintiff has compared portions of the audio and video recordings with the written reports, notices, and other municipal records.

149. Where an exact quotation or precise timestamp remains subject to final discovery and verification, Plaintiff identifies it as approximate rather than verbatim.

## III. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

Municipal Liability Under Monell (42 U.S.C. § 1983)

(Against Defendant City of Eureka Only)

150. Plaintiff incorporates the preceding factual allegations by reference as if fully set forth herein.

151. The City of Eureka maintained and enforced an unconstitutional municipal practice and custom concerning the regulation and removal of personal property from public areas through the systemic deployment of conflicting City-issued Notices to Vacate.

152. Eureka Municipal Code § 130.14(C)(3) provides a specific procedure for ordinary stored personal property: after written notice is served, the property is deemed stored if it is not removed within 24 hours, after which the City may remove and impound it.

153. Section 130.14(D)(1) further specifies the information that a pre-removal notice must contain, including an explicit statement that the property will be impounded if it is not removed within 24 hours.

154. The City's adoption of the ordinance occurred on August 2, 2016. During the public proceedings concerning the enforcement measure, the City Attorney stated that she did not know the language that would appear in the property-collection notice because she did not write it, and the City Manager likewise stated that he did not know what language would be included because they were not writing the notice. The City Council voted to adopt the measure despite these gaps.

155. The City adopted and continued using the notice mechanism without correcting its printed text to match the municipal code timeline, resulting in systemic procedural deficiencies.

156. The City-issued Notice to Vacate used against Plaintiff stated that personal property remaining after 72 hours would be removed by the City, creating an irreconcilable timeline contradiction with the 24-hour window defined in § 130.14(C)(3).

157. The City-issued notice simultaneously commanded that "All personal property must be removed immediately," while the subsequent sentence of the exact same document deferred removal until "after 72 hours," depriving residents of clear notice and due process.

158. The City-issued notice integrated text stating that camping and public storage constitute "violations of law," threatening immediate criminal law enforcement consequences on a form ostensibly designed for a passive, non-penalty administrative property-management procedure.

159. The City-issued notice included a tracking clause extending enforcement to property "deemed to have been relocated to another area within the City," permitting City personnel to utilize a notice served at one geographic location as a continuous enforcement mechanism at entirely separate locations without issuing a new localized warning.

160. The notice form bore the institutional branding and header of the Eureka Police Department ("EPD #130-9/2021"), but the City deployed unsworn, civilian Municipal Rangers to issue these forms, utilizing civilian employees to distribute documents threatening criminal law penalties.

161. This practice was repeated such that City personnel routinely relied upon these legally deficient notice records as part of the City's formal enforcement process.

162. The City further maintained a retaliatory custom and practice of suppressing Plaintiff's political expression through the authorized deployment of heavy municipal equipment. The multi-year use of a City water truck to erase Plaintiff's "Chalk Talk" messages required administrative scheduling, resource allocation, and oversight from Wilkes's superiors. Because such municipal assets cannot be repeatedly deployed without creating operational records or receiving higher-level directives, the erasure of Plaintiff's speech constitutes an official policy, custom, or sanctioned practice by City management to selectively target and suppress viewpoint-based political expression.

163. On February 12, 2024, Officer Jon Omey's report identified multiple prior contacts involving Plaintiff, including contacts involving Notices to Vacate issued by Municipal

Ranger Graham, demonstrating the operational link between the notice history and subsequent seizures.

163. The City's structural practice of utilizing a single notice form that weaves immediate criminal law threats and shifting compliance timelines into a passive civil storage framework was a moving force behind the subsequent enforcement actions involving Plaintiff's property and expression.

164. As a direct and proximate result of the City's unconstitutional policy, practice, or custom, Plaintiff suffered deprivations of rights secured by the Constitution, including rights protected by the First and Fourth Amendments.

165. The City is therefore liable under 42 U.S.C. § 1983 for the constitutional injuries caused by its own policy, practice, or custom.

SECOND CAUSE OF ACTION

First Amendment Retaliation and Viewpoint-Based Enforcement (42 U.S.C. § 1983)

(Against All Defendants)

A. Against Defendant Donald Wilkes (Individual Capacity)

166. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

167. Plaintiff engaged in protected political expression concerning City policies and the treatment of unhoused persons, including sidewalk writing along the Waterfront Trail and a large sign concerning the legality of camping in a particular public area.

168. Defendant Wilkes encountered Plaintiff's political expression.

169. Wilkes repeatedly erased Plaintiff's political "Chalk Talk" messages from the Waterfront Trail using a municipal water truck.

170. Wilkes personally asked Plaintiff to stop writing political messages or move those messages to City Hall, stating that moving the messages would reduce the amount of work required of City personnel.

171. On February 12, 2024, Plaintiff displayed a large political sign addressing the legality of camping in the area titled "Camp Legal."

172. Wilkes participated in the removal of Plaintiff's sign and pallets.

173. Wilkes told Plaintiff that police had authorized the removal.

174. Wilkes subsequently provided information concerning the dispute to Officer Omey and expressed a desire to have Plaintiff prosecuted.

175. Defendant Wilkes participated in a verbal conversation captured on body-worn-camera footage where City personnel arranged for a disposal trailer to take Plaintiff's belongings to the dump before conducting any physical or safety inspection of the property.

176. Wilkes's actions were directed at Plaintiff's political expression and occurred because of, and were substantially motivated by, Plaintiff's continued exercise of First Amendment rights.

177. Wilkes is therefore liable in his individual capacity under § 1983 for his personal participation in the deprivation of Plaintiff's First Amendment rights.

B. Against Defendant Cole Forbes (Individual Capacity)

178. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

179. Forbes participated in the removal of Plaintiff's political sign and pallets on February 12, 2024.

180. Forbes photographed Plaintiff's large political sign and transmitted the photograph to Officer Omey.

181. The photograph became part of the police investigation.

182. Forbes reported that Plaintiff had erected another sign and pallets and characterized Plaintiff's conduct as a continuing dispute concerning the property.

183. Forbes participated in the City's removal of Plaintiff's political sign.

184. Defendant Forbes participated in a verbal conversation captured on body-worn-camera footage where City personnel arranged for a disposal trailer to take Plaintiff's belongings to the dump before conducting any physical or safety inspection of the property.

185. Forbes's actions contributed directly to the enforcement directed at Plaintiff's protected political expression.

186. Forbes is therefore liable in his individual capacity for his personal participation in the deprivation of Plaintiff's First Amendment rights.

C. Against Defendant Jon Omey (Individual Capacity)

187. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

188. On February 12, 2024, Omey received information from City employee Donald Wilkes concerning Plaintiff's political sign.

189. Omey's police report states that Wilkes sent him a photograph of the large sign and advised that he intended to remove the sign and pallets.

190. Omey subsequently encountered Plaintiff while Plaintiff was attempting to address the removal of his political property.

191. Plaintiff told Omey that City employees had taken his protest signs and that the police had authorized the removal.

192. Omey responded, "Yeah, absolutely."

193. Defendant Omey participated in a verbal conversation captured on body-worn-camera footage where City personnel arranged for a disposal trailer to take Plaintiff's belongings to the dump before conducting any physical or safety inspection of the property.

194. Omey thereafter participated in the enforcement action arising from the dispute over Plaintiff's political expression, causing Plaintiff to be placed into a separate transport vehicle and removed from the scene.

195. Omey also took Plaintiff into custody and subsequently investigated the property involved in the dispute.

196. Omey's actions were directly related to and motivated by Plaintiff's continued exercise of political expression.

197. Omey is therefore liable in his individual capacity for his personal participation in the deprivation of Plaintiff's First Amendment rights.

D. Against Defendant City of Eureka (Municipal Liability)

198. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

199. The acts described above were carried out by City employees acting within the course and scope of their employment.

200. The enforcement directed against Plaintiff's political expression was undertaken pursuant to, or was caused by, the City's policies, practices, customs, or longstanding methods of enforcement described herein.

201. The City is therefore liable under § 1983 to the extent the constitutional violation was caused by a City policy, practice, or custom.

THIRD CAUSE OF ACTION

Fourth Amendment Unreasonable Seizure and Destruction of Property (42 U.S.C. § 1983)

(Against All Defendants)

A. Against Defendant Donald Wilkes (Individual Capacity)

202. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

203. On February 12, 2024, Wilkes participated in removing Plaintiff's signs and pallets from the Waterfront Trail area.

204. Plaintiff objected to the removal and asserted that the property belonged to him, but Wilkes nevertheless continued participating in the removal.

205. Following a conversation to get a disposal trailer before inspecting the property, and after Plaintiff was driven away from the scene in a separate police transport vehicle, Defendant Wilkes participated in using a powered reciprocating saw to cut apart, destroy, and permanently dump Plaintiff’s trailer and personal belongings.

206. Wilkes participated in the taking and permanent destruction of Plaintiff's personal property without Plaintiff's consent and without a warrant.

207. Wilkes's personal participation caused Plaintiff to suffer permanent loss of possession and use of his property.

208. Wilkes is therefore liable in his individual capacity under § 1983 for the Fourth Amendment violation arising from his personal seizure and destruction of Plaintiff's property.

B. Against Defendant Cole Forbes (Individual Capacity)

209. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

210. Forbes participated with Wilkes in removing Plaintiff's signs and pallets, and had personal involvement in the removal of Plaintiff's property on February 12, 2024.

211. Following a conversation to get a disposal trailer before inspecting the property, and after Plaintiff was driven away from the scene in a separate police transport vehicle, Defendant Forbes participated in using a powered reciprocating saw to cut apart and destroy Plaintiff’s trailer and belongings.

212. Forbes participated in the seizure, removal, and permanent destruction of Plaintiff's personal property without Plaintiff's consent and without a warrant.

213. Forbes is therefore liable in his individual capacity under § 1983 for his personal participation in the unreasonable seizure and destruction of Plaintiff's property.

C. Against Defendant Jon Omey (Individual Capacity)

214. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

215. Omey became involved after City employees had already begun removing Plaintiff's property.

216. Plaintiff specifically informed Omey that City employees had taken his protest signs, and Omey acknowledged and ratified the City's authorization of the removal, stating "Yeah, absolutely."

217. Defendant Omey participated in the conversation where the disposal trailer was discussed before any physical inspection of the campsite had taken place.

218. Omey thereafter ordered Plaintiff to be placed into a separate transport vehicle and removed from the scene. Omey stayed at the scene and handled the property, authorizing, directing, or ratifying the immediate cutting up and destruction of Plaintiff's trailer via a powered reciprocating saw without obtaining a warrant or utilizing standard impoundment holding protocols.

219. Omey participated in, directed, or ratified the seizure and permanent destruction of Plaintiff's property without a warrant authorizing the particular seizure or destruction of that property.

220. To the extent Omey personally participated in, planned, or ratified the seizure and destruction of property without lawful Fourth Amendment justification, he is liable in his individual capacity under § 1983.

D. Against Defendant City of Eureka (Municipal Liability)

221. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

222. The seizures and permanent destruction of Plaintiff's property were caused by the City's policies, practices, customs, and enforcement procedures concerning the treatment and disposal of personal property belonging to unhoused individuals in public areas.

223. The City's notice practice described in the First Cause of Action formed an integral part of the municipal enforcement system through which City personnel dealt with Plaintiff's personal property.

224. To the extent the individual actions described above were undertaken pursuant to or caused by a City policy, practice, or custom, the City is liable under § 1983 for the resulting Fourth Amendment deprivation.

IV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1. For compensatory damages according to proof at trial;

2. For punitive damages against the individual Defendants Wilkes, Forbes, and Omey in an amount according to proof at trial;

3. For a declaratory judgment that the City's Notice to Vacate policies and practices violate the First and Fourth Amendments;

4. For reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

5. For costs of suit incurred herein; and

6. For such other and further relief as the Court deems just and proper.

Dated: September 15, 2026 Respectfully submitted,

*/s/ Kelly Pifferini*

Kelly Pifferini, Plaintiff Pro Se

COMPLETE EVIDENCE LIST

EXHIBIT A: Body-Worn Camera (BWC) Video and Audio Recording from Community Service Ranger Victoria Graham, dated October 19, 2023.

EXHIBIT B: Body-Worn Camera (BWC) Video and Audio Recording from Officer DT, dated October 19, 2023.

EXHIBIT C: Body-Worn Camera (BWC) Video and Audio Recording from Sergeant John Eckert, dated October 19, 2023.

EXHIBIT D: Body-Worn Camera (BWC) Video and Audio Recording from Officer Jon Omey, dated February 12, 2024.

EXHIBIT E: Body-Worn Camera (BWC) Video and Audio Recording from Community Service Ranger Victoria Graham, dated February 6, 2024.

EXHIBIT F: Copy of the City of Eureka "NOTICE TO VACATE" form, bearing notation EPD #130-9/2021, showing the handwritten date of November 9, 2023, issued by Ranger Graham.

EXHIBIT G: Public Record Materials and Minutes of the August 2, 2016 Eureka City Council Meeting regarding Ordinance 844-C.S. and EMC § 130.14.

EXHIBIT H: Public Record Video Recording of the August 2, 2016 Eureka City Council Meeting, showing the statements of the City Attorney, City Manager, and the subsequent council vote.

EXHIBIT I: Certified Copy of Court Order dismissing all criminal charges arising from the October 19, 2023 arrest in the interest of justice.

EXHIBIT J: Work shift logs and schedule protocols for City Community Service Rangers/Municipal Rangers, establishing the standard operating hours of Victoria Graham.

EXHIBIT K: Photograph records of Plaintiff's original "Camp Legal" cardboard and pallet sign contained within Officer Omey's official police report.

EXHIBIT L: Official Eureka Police Department Misdemeanor Report, Case No. 24-000611, prepared by Officer Jon Omey on February 12, 2024, and approved on February 16, 2024.

EXHIBIT M: Computer-Aided Dispatch (CAD) Log Records for incident dates: January 9, January 24, January 30, February 6, February 7, and February 12, 2024.

EXHIBIT N: Official Eureka Police Department Property and Evidence Records, Case No. 24-000611, documenting items retained for safekeeping and items marked for destruction or immediate disposal.

EXHIBIT O: Humboldt Waste Management log sheets, weight receipts, and disposal manifests from February 12, 2024, tracking property delivered by Defendants Wilkes and Forbes.